# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-672

**BLACK RIVER CRAWFISH FARMS, LLC**

**VERSUS**

**JACK A. KING, JR., ET AL.**

**********

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 47,021
HONORABLE GLEN WADE STRONG, DISTRICT JUDGE

**********

**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and John E. Conery, Judges.

**EXCEPTION OF NO RIGHT OF ACTION
GRANTED; DISMISSAL AFFIRMED.**

Paul M. Adkins
William Timothy Allen, III
Blanchard, Walker, O'Quin & Roberts
P. O. Drawer 1126
Shreveport, LA 71163-1126
Telephone: (318) 221-6858
COUNSEL FOR:
    Defendants/Appellees - John Martin King, Trustee of Billy D. King Trust, Deborah Ann King Rudolph, Trustee of Billy D. King Trust, Michael Todd King, Trustee of Billy D. King Trust, and Stephen Paul King, Trustee of Billy D. King Trust

**James J. Davidson, III**
**Davidson, Meaux, Sonnier, McElligott, Fontenot, Gideon & Edwards**
**P. O. Drawer 2908**
**Lafayette, LA 70502**
**Telephone: (337) 237-1660**
**COUNSEL FOR:**
    **Plaintiff/Appellant - Black River Crawfish Farms, LLC**

**John Michael Veron**
**Veron, Bice, Palermo & Wilson**
**P. O. Box 2125**
**Lake Charles, LA 70602-2125**
**Telephone: (337) 310-1600**
**COUNSEL FOR:**
    **Plaintiff/Appellant - Black River Crawfish Farms, LLC**

**Virgil Russell Purvis, Jr.**
**Smith, Taliaferro & Purvis**
**P. O. Box 298**
**Jonesville, LA 71343**
**Telephone: (318) 339-8526**
**COUNSEL FOR:**
    **Plaintiff/Appellant - Black River Crawfish Farms, LLC**

**Dennis Woodford Hallack**
**Hallack Law Firm**
**P. O. Box 1706**
**West Monroe, LA 71294**
**Telepone: (318) 323-7706**
**COUNSEL FOR:**
    **Defendant/Appellee - Big Pine Petroleum, Inc.**

**THIBODEAUX, Chief Judge.**

Black River Crawfish Farms, LLC (Black River) filed suit against several mineral servitude owners, asserting restoration claims pursuant to La.R.S. 31:22 (hereinafter "Article 22") for the contamination of its property resulting from historical oil and gas exploration activities. Thereafter, certain alleged servitude owners, John Martin King, Michael Todd King, Stephen Paul King, and Deborah Ann King Rudolph, as Trustees of the Billy D. King, M.D. Revocable Trust (King Trustees), filed a peremptory exception of prescription of nonuse. The trial court granted the exception, dismissing Black River's claims with prejudice. Finding no error in the trial court's reasoning as to the effect of the extinguishment of the mineral servitude by prescription of ten years nonuse, we affirm the dismissal of Black River's claims against the King Trustees after first noticing and sustaining an exception of no right of action against Black River.

I.

**ISSUES**

Black River asks this court to decide:

(1)     whether the trial court's reasons for holding that Black River's restoration claims under Article 22 were prescribed by nonuse are supported by the law and the evidence;

(2)     whether the trial court's reasons for holding that Black River's claims against the King Trustees were barred by the subsequent purchaser rule are supported by the law;

(3)     whether the trial court's reasons for holding that the King Trustees were not jointly and severally liable with the other servitude owners and oil and gas operators who contaminated Black River's

property are supported by the law and the evidence; and

(4) whether the trial court erred by holding that the doctrine of judicial estoppel did not bar the King Trustees from disavowing their mineral servitude on the eve of trial, after the window for discovery had closed?

II.

**FACTS AND PROCEDURAL HISTORY**

This mineral law case involves 189 acres of land located in Concordia Parish, Louisiana, of which Black River is the current and undivided owner. It is undisputed that in 1946, Billy D. King and his siblings, Jack A. King and Mary King Carpenter, each owned an undivided one-third interest in the Horseshoe Plantation, which consisted of 1406 acres in Concordia Parish. That year, the siblings executed a mineral lease pursuant to which a producing well (BD King well) was drilled in 1953.

By deed dated September 4, 1953, Jack A. King conveyed his ownership interest in the land to his brother Billy D. King, while reserving a one-third mineral servitude over the property. On August 19, 1957, Mary King Carpenter executed a deed transferring her ownership interest in the Horseshoe Plantation to Billy D. King, while likewise reserving a one-third mineral servitude over the property. That same month, by deed dated August 21, 1957, Billy D. King transferred ownership of 320 acres of the plantation to Stella Calhoun, reserving a one-third mineral servitude in his favor over the 320-acre tract.

On April 20, 1988, Stella Calhoun sold approximately 189 acres of the 320-acre tract to Concordia Fisheries, Ltd. The deed contained no reservation of any interest in the underlying minerals, as at that time the three King siblings

2

each held one-third mineral servitudes in the tract. In 1996, Billy D. King transferred his one-third mineral servitude to the Billy D. King, M.D. Revocable Trust (trust). On November 19, 2003, Concordia Fisheries, Ltd. sold the 189-acre tract to Black River. Again, there was no reservation of minerals in that transaction or assignments of any personal rights.

On February 22, 2012, Black River filed the present litigation against various defendants who were alleged to be mineral servitude owners, operators, and/or mineral lessees of its property, seeking restoration pursuant to Article 22, among other claims.[1] The King Trustees were sued solely in their capacities as the alleged owners of the mineral servitude created by Billy D. King's reservation of his one-third mineral interest in the transfer to Stella Calhoun in 1957.

In response, the King Trustees initially filed a peremptory exception of no right of action, contending that Black River's claims were barred under the subsequent purchaser rule. They argued that the right Black River sought to enforce was a personal right belonging to the person who owned the land at the time the damage occurred, citing *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 10-2267, 10-2272, 10-2275, 10-2279, 10-2289 (La. 10/25/11), 79 So.3d 246.[2] Because the transfer to Black River in 2003 did not contain an assignment of

---

[1]This appeal only involves Black River's claims against the King Trustees. Therefore, we pretermit any discussion of the remaining defendants or the rights that Black River may have against those defendants.

[2]In this plurality opinion, the supreme court reaffirmed the subsequent purchaser rule, recited as

> a jurisprudential rule which holds that an owner of property has no right or actual interest in recovering from a third party for damage which was inflicted on the property before his purchase, in the absence of an assignment or subrogation of the rights belonging to the owner of the property when the damage was inflicted.

*Id*. at 256-57.

any personal rights, the King Trustees claimed that Black River had no right to bring the litigation against them. Alternatively, they argued that, regardless, no rights were passed to Black River because the mineral servitude and correlative obligations arising therefrom had prescribed by ten years nonuse in 2000, three years prior to Black River's purchase of the property.

Black River, however, contended that the mineral servitude created by the 1957 deed created a real right, which carried with it corresponding real obligations and, as such, was not governed by the subsequent purchaser rule. The trial court agreed, stating that a mineral servitude

> is a real right that passes with the transfer of land and gives rise to rights and duties of the landowner and the servitude owner. A mineral servitude is a real obligation that attaches to the land and a real obligation passes to a subsequent acquirer without need of a stipulation to that effect.

After the trial court denied the exception, Black River filed its motion for partial summary judgment, seeking to establish the mineral servitudes burdening its property. The King Trustees, in turn, filed their peremptory exception of prescription of nonuse, arguing that their mineral servitude was last exercised, at the latest, in 1990, some thirteen years prior to Black River's acquisition of the property. Accordingly, they again asserted that the mineral servitude, forming the sole basis for Black River's claims against them, had lapsed, along with the correlative obligation to restore the property ten years following the last exercise of the servitude rights and three years before Black River acquired the property.

In support of their position, the King Trustees relied upon the undisputed expert report rendered on August 17, 2016, by Black River's expert,

4

RBB Consulting, LLC. The report identified a total of four wells drilled on the property and provided the status of each well. Three of the four wells were "dry plugged," the latest one in 1981. The only well that actually produced, the BD King, "was spudded in 1953 and operated as a producing oil well until it was converted into a saltwater disposal well in 1982." It then operated as an injection well from 1982 until it was plugged and abandoned in 1989. Another well was drilled on January 23, 1990, but it was a dry hole that was immediately plugged and abandoned on January 26, 1990.[3]

After hearing oral argument on both the motion and the exception and taking the matter under consideration, the trial court granted the motion for partial summary judgment "recognizing Black River as the current surface owner of the property and that three mineral servitudes created in 1953 and 1957 burdened Plaintiff's property." But it denied all the remaining issues Black River sought to establish. The trial court also granted the King Trustees' exception, holding that the mineral servitude was extinguished by prescription of ten years nonuse, at the latest, in January 2000. In so ruling, the trial court reasoned: "As there was no real right in existence in 2003 when Black River acquired the property, no correlative real obligation to restore the property was transferred to Black River." Black River now appeals the granting of the exception and the dismissal of its claims against the King Trustees.

---

[3]This well was drilled on property burdened by the servitudes but not part of Black River's 189-acre tract.

5

III.

## STANDARD OF REVIEW

An appellate court reviews the factual findings of a trial court under the manifest error-clearly wrong standard of review. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). The trial court's legal conclusions on questions of law, however, are reviewed de novo. *City of Bossier City v. Vernon*, 12-78 (La. 10/16/12), 100 So.3d 301.

IV.

## LAW AND DISCUSSION

"All that must be considered in the peremptory exception of prescription is whether there is sufficient evidence to show that the alleged time period has run under the requirements of the particular code articles involved." *Montgomery v. Breaux*, 297 So.2d 185, 187 (La.1974). The time period at issue herein is set forth in La.R.S. 31:27, which provides, in pertinent part: "A mineral servitude is extinguished by . . . prescription resulting from nonuse for ten years." "Prescription of nonuse of a mineral servitude commences from the date on which it is created" and "is interrupted by good faith operations for the discovery and production of minerals." La.R.S. 31:28 and 31:29. "Prescription commences anew from the last day on which actual drilling or mining operations are conducted." La.R.S. 31:30.

No one disputes that the evidence clearly and reasonably shows that the mineral servitude owned by the trust has not been exercised since January 1990, and, therefore, was extinguished by prescription of nonuse in January 2000, ten years after the last dry hole was drilled, plugged, and abandoned. Accordingly,

we find no error in the trial court's evaluation of the evidence and its conclusion as to the accrual of prescription. We note, however, that although styled as a peremptory exception of prescription of nonuse, the objection raised by the King Trustees is really one of no right of action, which, as an appellate court, we may notice on our own motion. La.Code Civ.P. art. 927.

"The function of the exception of no right of action is to determine whether the plaintiff belongs to the class of persons to whom the law grants the cause of action asserted in the suit." *Hood v. Cotter*, 08-237, p. 17 (La. 12/2/08), 5 So.3d 819, 829. This is so because "[a]n action can only be brought by a person having a real and actual interest, which he asserts." *Howard v. Adm'rs of Tulane Educ. Fund*, 07-2224, p. 8 (La. 7/1/08), 986 So.2d 47, 54.

In ruling on an exception of no right of action, a court first looks to the pleadings, though evidence may also be considered, if properly introduced. *Id.* Black River, in its petition and amending petition, seeks to enforce the alleged mineral servitude owner's duty to restore the surface of the land set forth in Article 22, which provides:

> The owner of a mineral servitude is under no obligation to exercise it. If he does, he is entitled to use only so much of the land as is reasonably necessary to conduct his operations. He is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time.

"A real action is one brought to enforce rights in, to, or upon immovable property." La.Code Civ.P. art. 422. "An action to enforce an obligation is the property of the obligee." La.Code Civ.P. art. 426. Thus, the question central to the resolution of this matter is whether Black River has the right to enforce this obligation against the King Trustees.

7

Essential to the determination of this question is a proper understanding of the nature of the real obligation at issue herein. Under our modern civilian doctrine, "[a] real obligation is a duty correlative and incidental to a real right." La.Civ.Code art. 1763. "[A] real right can be understood as ownership and its dismemberments." *Eagle Pipe*, 79 So.3d at 258.

"Perfect ownership consists of the use, the enjoyment, and the disposal of the thing—the *usus*, *fructus*, and *abusus*." *In re Morgan R.R. & S.S. Co.*, 32 La. Ann. 371, 374 (1880). These rights of ownership—"[t]he rights of use, enjoyment, and disposal"—may be dismembered by operation of law or intent of the owner. *Id*. at 375. A mineral servitude is one such dismemberment of ownership that confers a real right on the mineral servitude owner: "the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership." La.R.S. 31:21. As a correlative obligation governing the dismemberment of the usus and fructus rights of ownership of the land, the owner of a mineral servitude "is obligated, insofar as practicable, to restore the surface to its original condition at the earliest reasonable time." La.R.S. 31:22.[4]

Significantly, however, "a real obligation does not exist in the absence of a real right." *Eagle Pipe*, 79 So.3d at 261. "Prescription of nonuse is a mode of extinction of a real right other than ownership as a result of failure to exercise the right for a period of time." La.Civ.Code art. 3448. Upon accrual of prescription,

---

[4]We note that, although Black River's petition seeks redress for the contamination of its property due to historic oil and gas operations conducted thereon, the plain language of Article 22 strictly sets forth a duty "to restore the surface" only. This duty, by its explicit terms, is not equivalent to the environmental contamination and remediation now regulated and governed by the provisions of La.R.S. 30:29 (Act 312), enacted in response to the seminal case of *Corbello v. Iowa Prod.*, 02-826 (La. 2/25/03), 850 So.2d 686.

the real right is "no longer in existence[,]" and no real obligations correlative to that right remain. *Wise v. Watkins*, 222 La. 493, 62 So.2d 653, 656 (1952).

By operation of law, the real right of the mineral servitude at issue herein was extinguished by "prescription resulting from nonuse for ten years," at the latest, in January 2000. La.R.S. 31:27. At that time, the real right, along with any correlative obligations arising therefrom, no longer existed.

Furthermore, when the servitude was extinguished in January 2000, the dismembered portions of ownership, the mineral rights, reverted to the landowner. *Neumin Prod. Co. v. Tiger Bend, Ltd.*, 10-1307 (La.App. 3 Cir. 3/9/11), 58 So.3d 1088, *writ denied*, 11-717 (La. 5/20/11), 63 So.3d 984. At that time, Concordia Fisheries, Ltd. became "the owner of the minerals on the property as the owner of the surface of the property." *Id*. at 1093. Pursuant to the rule of confusion, as both the owner of the land and the minerals, Concordia Fisheries, Ltd. could not be bound to render a performance to itself:

> When the qualities of obligee and obligor are united in the same person, the obligation is extinguished by *confusion*. Indeed, an obligation is a legal relation whereby an obligor is bound to render a performance to an obligee. Since no one may be bound to render a performance to himself, when obligee and obligor are the same person the obligation no longer has a purpose and therefore comes to an end. Thus, confusion is one of the manners in which obligations are extinguished, and also a legal obstacle that makes an obligation ineffective.

S. Litvinoff & R. Scalise, 5 *La. Civil Law Treatise: Law of Obligations* § 20.1 (2d ed. 2016) (footnotes omitted). In this manner, the real obligation set forth in Article 22 was extinguished by confusion in 2000 when the ownership of the surface estate was reunited with the ownership of the minerals, thus uniting the qualities of the obligee and the obligor in the same entity, Concordia Fisheries, Ltd.

9

Consequently, by January 2000, all real rights and correlative obligations arising from the mineral servitude were extinguished by law. It logically follows, therefore, that because neither the real right nor the correlative obligation existed when Black River acquired the property in 2003, Black River never acquired the right to enforce the real obligation to restore the surface.[5] Accordingly, our review of the petitions and the evidence of record reveals that Black River does not have a right of action to seek restoration against the King Trustees.

## V.

## CONCLUSION

For the foregoing reasons, we render judgment sustaining the peremptory exception of no right of action, properly noticed on our own motion, and affirm the trial court's dismissal of Black River's claims against the King Trustees.

Costs of this appeal are assessed to the Plaintiff/Appellant.

**EXCEPTION OF NO RIGHT OF ACTION GRANTED; DISMISSAL AFFIRMED.**

---

[5]In finding that Black River has no right of action, we pretermit discussion of Black River's remaining assignments of error.